478 F.2d 1405
 85 L.R.R.M. (BNA) 2187, 71 Lab.Cas. P 13,834
 NOTICE: Seventh Circuit Rule 53(b)(2) states unpublished orders shall not be cited or used as precedent except to support a claim of res judicata, collateral estoppel or law of the case in any federal court within the circuit.
** National Labor Relations Board, Petitioner
v.
Marathon Oil Company, Respondent
 No. 72-1309.
 United States Court of Appeals, Seventh Circuit.
 June 11, 1973.
 
 Before SWYGERT, Chief Judge, CUMMINGS, Circuit Judge, and STEVENS, Circuit Judge.
 
 Order
 
 1
 The Labor Board found that Richard McIntire's concerted and union activities were a significant factor in respondent's decision to discharge him on March 9, 1971, concluded that the discharge violated Secs. 8(a)(3) and (1) of the National Labor Relations Act, and ordered reinstatement.
 
 
 2
 Respondent contends that the evidence establishes (1) that the company did not have knowledge of McIntire's current union activities, and (2) that his complaints about hauling illegal overweight loads were not concerted activities protected by the Act. We think the findings relating to union activity adequately support the order and that there is substantial evidence supporting those findings.
 
 
 3
 Preliminarily, we express our agreement with the Trial Examiner's appraisal of the company's explanation that McIntire was fired because he was a "chronic griper" and his objections to overweight loads were simply the straw that broke the camel's back. The examiner stated:
 
 
 4
 "The incidents involving customer complaints mentioned previously herein, appear to be somewhat normal happenings in this type of a hauling operation (other drivers have had their troubles also) and certainly McIntire's difficulties never reached such seriousness to warrant any adverse considerations and, regardless of them, the Company still thought very highly of McIntire as a driver. In fact, it seems to me that any happenings which might adversely reflect on McIntire's work habits, must be regarded with considerable doubt as McIntire was once again asked to be the terminal dispatcher during the summer weeks of 1971. I question whether such a responsible job even though temporary, would be offered to a man who supposedly was continually insubordinate and a chronic griper. Obviously, the Respondent's representatives in management thought very highly of him, and were again willing to afford him opportunities in gaining experience for future advancements." A. 14.
 
 
 5
 We think the evidence adequately supports the inference that the company was aware of McIntire's union activities and that those activities were a significant factor in the discharge decision.
 
 
 6
 On November 9, 1969, 16 months before the discharge, the union lost a Board-supervised election by a vote of 6 to 3. McIntire had been active in the organizing drive, had signed an authorization card, and had obtained cards for other drivers. At that time he apparently discussed the union issue frankly with Supervisor Hermon; as a result of such discussion, Hermon made it clear that his superiors were unhappy about the union drive and McIntire made it clear that he was in favor of the union.
 
 
 7
 Late in 1970, McIntire talked to a union business representative about authorization cards, but was informed that activity would then be premature since a year had not elapsed since the November, 1969, election.
 
 
 8
 In January of 1971, McIntire once again started talking with other drivers at the Muncie terminal about the union. The Examiner found that he "told several of them they had made a mistake in 1969 by not getting the union in when they had a chance to do so."
 
 
 9
 On February 18, 1971, the company had one of its quarterly safety meetings, attended by all of the Muncie drivers and four supervisory personnel. Two issues, neither of which related directly to safety, but both of which related to the possible benefit of union representation, were openly discussed by McIntire. On the subject of hospital insurance, McIntire first pointed out that respondent's coverage only repaid him $16 out of his total cost of $24 for having a growth removed from his chest; later McIntire stated that "if the employees had Teamster insurance that it would pay for such things as eyeglasses and dental care." In the discussion which ensued, McIntire introduced the second subject not directly related to safety. As the Examiner found, McIntire asked "why transport drivers represented by the Teamsters had received a 55-cent raise while the Respondent's drivers had only gotten a 38-cent raise. Holmes said the Company felt its drivers were receiving a fair wage, but that if McIntire wanted to make that kind of money he should go to work for Texaco."
 
 
 10
 On March 6, 1971, the Saturday before his discharge, McIntire testified that he talked to other drivers at the Muncie terminal about the union. Specifically, he testified that he asked drivers Strong and Miller if they would sign a union card and how they felt about the union. Driver Walton testified that McIntire had merely inquired generally what he thought of the union, but did not press the matter when Walton replied that he did not know.
 
 
 11
 Respondent's witnesses uniformly denied knowledge of the conversations on March 6, 1971, or, indeed, of any current union activity by McIntire. Moreover, the Examiner did not specifically find that the company was aware of McIntire's conversations on March 6. Nevertheless, we are persuaded that the record as a whole--including the company's knowledge of McIntire's activities in connection with the November, 1969, organizing drive, its expressed attitude toward that drive, McIntire's pointed prounion comments at the meeting on February 18, 1971, the hostile reaction provoked by those comments, the likelihood that at a terminal with such a small complement of workers his activities in January, 1971 (and perhaps March as well), would be known to management presumably conscious of the fact that the year after the election had recently elapsed, and the unsatisfactory character of its asserted justifications for the discharge--supports the Examiner's inference that McIntire's union activities were a significant factor in the discharge decision. Cf. NLRB v. Ampex Corp., 442 F.2d 82, 86 (7th Cir.1971). When we balance the interference with Sec. 7 rights against respondent's asserted business justifications, one of which (the claim that McIntire was a "chronic bitcher") seems somewhat contrived because it places undue emphasis on the lack of amenities that teamsters may rarely observe, and the other of which (the threat to complain to the police if respondent continued to require its drivers to haul overweight loads)[1], though quite clearly genuine, is offensive to public policy, we readily agree with the Board that the former outweighs the latter. See Textile Workers v. Darlington Co., 380 U.S. 263, 268-269.
 
 
 12
 Enforced.
 
 
 
 **
 25-CA-4213; 195 NLRB No. 70
 
 
 [1]
 The record supports the conclusion that McIntire and several of his fellow employees were concerned about the company practice of dispatching drivers with overweight loads. They felt that the overweight loads, which violated state law, were a safety hazard. On March 3, 1971, just before his discharge, McIntire complained to his superiors about the practice. McIntire testified that he told Supervisor Hermon, "If you want to fire me for refusing to haul illegal loads then fire me." A. 116. McIntire at the same time threatened to call the state police if he was again dispatched illegally. A. 116